UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ANTHONY EDENFIELD, SR. | * | CIVIL ACTION NO. 22-5060 |
| | * | |
| VERSUS | * | DIVISION 1 |
| | * | |
| NEW ORLEANS CITY | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| | * | |
| | * | |
| ************************************* | * | |

ORDER AND REASONS

Before the Court is the defendant's Motion for Summary Judgment. (Rec. Doc. 42). Viewing the evidence in the light most favorable to the plaintiff, he has nonetheless failed to establish a prima facie case of race discrimination. Accordingly, the defendant's Motion for Summary Judgment is GRANTED; plaintiff's complaint is hereby dismissed with prejudice.

Background

Anthony Edenfield was employed as a Sergeant for the New Orleans Police Department ("NOPD") in May and June 2020 when he made eight social media posts regarding the protests following the murder of George Floyd.[1] One of Edenfield's subordinates reported the comments to the NOPD, and the Public Integrity Bureau "PIB" initiated an internal investigation on June 19, 2020.[2] In this lawsuit, he challenges the resulting disciplinary action.

The following posts are at issue:

i.     On Thursday, May 28, 2020, at 8:40 AM, Sgt. Edenfield posted "Is this what you idiots call social justice? 'I got my justice!!! Got me some new matching sheets and towels.'" on his Facebook page and shared a video with 34.4 million view published by *FOX6 New Milwaukee* with the description, "Footage taken by a Minneapolis

---

[1] ECF No. 48-1, at 2.
[2] Id.; ECF No. 42-3, at 2.

journalist shows people rushing out of Target with loads of looted product in the wake of the officer-involved death of George Floyd."

ii.   On Saturday, May 30, 2020, at 9:15 PM, Sgt. Edenfield posted the comment "LMAO!!!! Out for the count" on his Facebook page and shared a video posted on Mike Gonzales-Guerrero's Facebook page with the comment, "Justified? Or excess force?" The video contains footage of a woman hitting a police officer in the face and another officer responding by hitting the women in the face.

iii.   On Saturday, May 30, 2020, at 10:35 PM, Sgt. Edenfield posted "Here are your animals" on his Facebook page when sharing a video published by *The Dayumm* with the description, "Man critically injured at Dallas Riots. It appears he attempted to defend a shop with a large sword Looters ran at him, then he charged rioters They then beat him with a skateboard and stoned him with medium sized rocks I called an ambulance and it's on the way."

iv.   On Saturday, May 30, 2020,  at 10:37 PM, Sgt. Edenfield posted "This shit has moved from being about George Floyd. These idiots want to act like animals, block the road and start a checkpoint asking people if they are police officers? I am running them over and shooting if lethal force were my only way out. The asshole under the truck got what he deserved" on his Facebook page and shared a *Law Enforcement Today* article with the subject line, "Alleged thief dragged by FedEx vehicle in St. Louis riots after protesters break into trucks."

v.   On Saturday, May 30, 2020, at 11:23 PM, Sgt. Edenfield posted "SAVAGES!!!! ANIMALS!!!!" and shared a video published by Proud to Be from East San Jose with

the description, "East San Jose protestors vandalizing people's cars on the freeway trying to drag people out of their cars and blocking traffic."

vi. On Sunday, May 31, 2020, at 11:08 PM Sgt. Edenfield shared a *Law Enforcement Today* article with the title, "New York Mayor's daughter arrested for blocking traffic, throwing objects at police" on his Facebook page with the post, "This trash bitch."

vii. On Thursday, June 4, 2020, at 5:58 AM, Sgt. Edenfield posted, "Burn down her house. Blow up her car and see if she still feels the same way" to his Facebook page and shared a *Daily Wire* article with the subject line "NYT Writer Nikole Hannah-Jones On Riots: Destroying Property Which Can Be Replaced Is Not Violence."

viii. On Thursday, June 4, 2020, at 8:29 PM, Sgt Edenfield posted "Animals!!! What is the point of this?" to his Facebook page and shared a June 1 *Conservative Nation* video with 6.2 million views with the subject line, "BREAKING VIDEO OF MINNEAPOLIS SEMI TRUCK BEING ATTACKED YESTERDAY BY PEACEFUL PROTESTERS AT I-35W BRIDGE!"[3]

On December 4, 2020, the NOPD issued a discipline letter outlining Edenfield's sustained violation and the penalty imposed under Paragraph 41 of Disciplinary Matrix.[4] The NOPD Policy Manual Rule of Professional Conduct 3 provides at subsection 13 that "Employees shall not post any material on the internet including but not limited to photos, videos, word documents, etc., that violates any local, state or federal law, and/or embarrasses, humiliates, discredits or harms the operations and reputation of the Police Department or any of its members."[5] Paragraph 40 of the Disciplinary Matrix (Chapter 26.2.1 of the NOPD Operational Manual) states "Employees shall

[3] ECF No. 42-1, at 1-2; ECF No. 48-1, at 1-2; ECF No. 13, at 4-5.
[4] ECF No. 48-1, at 2.
[5] ECF No. 48-10, at 4.

not post any material on the internet including but not limited to photos, videos, word documents, etc., that embarrasses, humiliates, discredits or harms the operations and reputation of the Police Department or any of its members."[6] This offense is classified as Level C, which corresponds to a presumptive penalty of 4-days suspension, a minimum penalty of 2-days suspension, and a maximum penalty of 10-days suspension.[7] Paragraph 41 of the Disciplinary Matrix states "Employees shall not post any material on the Internet that violates any local, state or federal law, or includes hate speech, discrimination or advocates unnecessary force."[8] This offense is classified as Level F, which corresponds to a presumptive penalty of 80-days suspension, a minimum penalty of 60-days suspension and a maximum penalty of demotion or dismissal.[9] Policy provides that the presumptive penalty is applied unless aggravating or mitigating circumstances exist and merit deviation to a lesser or greater penalty within the penalty range.[10]

The December 2020 letter described the course of the investigation and decision making process.[11] It explains that following the investigation and a disciplinary hearing, the Disciplinary Hearing Committee recommended finding Edenfield had violated Rule 3: Professional Conduct, Paragraph 13, Social Networking Websites, Facebook, Myspace, Print or Transmitted Media, etc. at Level C (1st Offense) with a 5-day suspension as penalty.[12] Deputy Chief Arlinda Westbrook

---

[6] ECF No. 48-5, at 7.

[7] Id. at 3, 7.

[8] Id. at 7.

[9] Id. at 3, 7.

[10] Id. at 2; ECF No. 48-1, at 3.

[11] Chapter 52.1.1 of the NOPD Operations Manual concerning Misconduct Complaint Intake and Investigation, provides that the PIB is primarily responsible for coordinating and supervising all disciplinary investigations. ECF No. 48-13, at 1. An investigation must be completed within 60 days and is considered complete upon written notice to the employee under investigation of a pre-disciplinary hearing or a determination of an unfounded or not sustained complaint. Id. at 2. "The PIB Deputy Superintendent shall review every completed investigative report from every bureau." Id. The PIB Deputy Superintendent either concurs or does not concur with the investigator's recommendations or those of any reviewing supervisor. Id. at 2-3. If she does not concur with any portion, she will compose her own "cover 105" if she determines a differing recommended disposition. Id. Once the PIB Deputy Superintendent approves the disposition of the investigation, the investigation disposition is transmitted to the Superintendent of Police for final disposition. Id. at 3.

[12] ECF No. 42-3, at 4.

authored a cover letter stating that she did not concur with the 5-day suspension penalty.[13] She stated that the multiple posts warranted a greater penalty at Level F (1st Offense – 60/80/D), explaining that:

> Police officers have a certain amount of discretion in making daily law enforcement decisions, but those decisions must be free of bias which would otherwise adversely affect their ability to undertake constitutional policing. Sgt. Edenfield's posts/comments leaves to ponder whether or not he can be trusted to use his power of discretion appropriately when interacting with all citizens. His posts/comments are racially insensitive and grossly inappropriate. His posts/comments appear to contain a racial undertone and exhibit elements of bias.[14]

Westbrook found that the discriminatory and sexist comments had a negative impact on the reputation of the NOPD, pointing out that in more than one post, Edenfield labeled a group of Black Lives Matter protesters "SAVAGES" and "ANIMALS" and that he labeled a Black female a "Trash Bitch."[15] Westbrook also found that the comments were numerous and that the comments affected the rights or liberties of other people (specifically citing the threat to "burn down her house, blow up her car" as a comment that could have caused injury to citizens and had the potential to incite lawless action and citing the threat that he is "running them over and shooting if lethal force were [his] only way out" as praising the injury of a protestor and verbalizing that he would use force in a similar situation).[16] She also expressed concern that the comments posed Brady/Giglio issues for Edenfield—that is, when a police officer is called as a witness in a court proceeding, the prosecutor must disclose impeachment evidence and, in Westbrook's view, the violation at issue falls within that legal requirement and calls Edenfield's credibility into

---

[13] Id.
[14] Id.
[15] Id.
[16] Id. at 4-5.

question.[17] Westbrook recommended finding that Edenfield violated Rule 3, Paragraph 13 at Level F and that he be dismissed.[18]

The letter, signed by Superintendent Shaun Ferguson, explained that Ferguson concurred with Westbrook's assessment and rationale and that he approved the disposition and penalty she recommended.[19]

Edenfield appealed his termination to the Civil Service Commission. The Commission found that the NOPD had carried its burden of showing that the conduct occurred, that it impaired the efficient operation of the NOPD, and that the posts violated the NOPD's social media policy.[20] But it also determined that "the penalty of termination is not commensurate with the infraction."[21] It found that Ferguson had not considered mitigating factors like Edenfield's 20-year work history with no discipline, his emotional state at the time, and his prior posts supportive of racial harmony.[22] It determined that Ferguson had aggravated the penalty because of the effect on Edenfield's ability to testify in court and lead other officers, but it found that elevation of the offense to a Level F penalty already accounted for this concern.[23] The Commission reduced the penalty to the presumptive penalty of an 80-day suspension and ordered NOPD to reinstate Edenfield with back wages and other emoluments of employment.[24]

NOPD appealed to the Fourth Circuit Court of Appeal, which reversed the Commission's decision reinstating Edenfield and awarding him back pay and emoluments.[25] The court of appeals

---

[17] Id. at 5.
[18] Id.
[19] Id. at 5-7.
[20] ECF No. 42-4, at 9.
[21] Id.
[22] Id.
[23] Id. at 9-10.
[24] Id. at 10.
[25] Edenfield v. New Orleans Police Dep't, 2022-0171 (La. App. 4 Cir. 10/10/22), 350 So. 3d 1022, 1028, writ granted, decision rev'd, 2022-01643 (La. 2/7/23), 354 So. 3d 661.

found aggravating factors present because Edenfield's numerous offensive comments on social media compromised his ability to testify in court and lead other officers and held that the appointing authority should be allowed to establish and enforce appropriate standards of conduct of employees.[26] Id. It held that the Commission had abused its discretion in reducing the penalty.[27] On February 7, 2023, the Louisiana Supreme Court reversed the decision of the court of appeals and reinstated the Commission's decision. No reasons were provided. Edenfield did not raise his claims of race discrimination before the Commission or during the court proceedings.[28]

Meanwhile, Edenfield filed the present lawsuit against the City of New Orleans[29] (the "City") on December 6, 2022. The parties consented to proceed before the Magistrate Judge.[30] The Court granted the City's motion to dismiss Edenfield's First Amendment claim in March 2023, leaving his claim under Title VII employment discrimination claim to proceed. The City filed its Answer on April 7, 2023. Trial is set to begin on May 13, 2024.

Presently, the City moves for summary judgment dismissing Edenfield's Title VII race discrimination claim.

Law and Analysis

1. *Standard for Summary Judgment*

Summary Judgment under Federal Rule of Civil Procedure 56 must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56. The movant has the initial burden of "showing the absence of a genuine issue as to any material fact." Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).

---

[26] Id.
[27] Id.
[28] Edenfield v. New Orleans Police Dep't, 2022-01643 (La. 2/7/23), 354 So. 3d 661.
[29] The City employed Edenfield.
[30] ECF No. 8.

The respondent must then "produce evidence or designate specific facts showing the existence of a genuine issue for trial." Engstrom v. First Nat. Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995). Evidence that is "merely colorable" or "is not significantly probative" is not sufficient to defeat summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

"An issue is material if its resolution could affect the outcome of the action." Daniels v. City of Arlington, Tex., 246 F.3d 500, 502 (5th Cir. 2001). Thus, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Although this Court must "resolve factual controversies in favor of the nonmoving party," it must only do so "where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013) (quoting Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). The Court must not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

"Summary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant." Armstrong v. City of Dallas, 997 F.2d 62, 67 (5th Cir. 1993). Summary judgment is also appropriate if the party opposing the motion fails to establish an essential element of her case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

2. *Res Judicata*

Pursuant to Federal Rule of Civil Procedure 8(c), a party must state any affirmative defense in its answer. Fed. R. Civ. P. 8(c)(1). Res judicata is explicitly listed as an affirmative defense

subject to Rule 8(c).  Indeed, the Fifth Circuit has observed that "[r]es judicata is an affirmative defense which is considered waived if not specifically pleaded in the answer or an amended answer permitted under Fed. R. Civ. P. 15(a)." Banc One Cap. Partners Corp. v. Kneipper, 67 F.3d 1187, 1199 (5th Cir. 1995).

The City did not raise res judicata as an affirmative defense when it answered Edenfield's Amended Complaint on March 1, 2023. Yet it now argues that he is precluded from raising race discrimination because he could have but did not do so in his Civil Service appeal, which ended in final judgment by the Louisiana Supreme Court. In fact, as Edenfield points out, during a discovery status conference with the undersigned on January 9, 2024, the City objected to presenting deposition testimony regarding its affirmative defenses, including failure to mitigate, contributory negligence, and negligence by third parties as referenced in the City's Answer. Counsel for the City affirmed that it would only present plaintiff's own testimony in support of its defenses of contributory negligence and failure to mitigate and that it would withdraw its defense of negligence by third parties. Based on this representation regarding the City's affirmative defenses, Edenfield withdrew the deposition topic seeking information regarding the City's affirmative defenses.  The City has not sought to amend its Answer, let alone explained why this Court should not find that it has waived its res judicata defense by waiting until it filed its Motion for Summary Judgment on February 27, 2024, to raise it.  The Court finds its res judicata defense has been waived.[31]

---

[31] In any event, it is unclear whether res judicata could apply here. Courts have held that when an employee challenges his termination through a civil service appeal before the civil service board/commission and the state courts, the employee may be barred from raising a subsequent Title VII employment discrimination claim arising out the same employment termination even if he did not raise discrimination in his civil service appeal, Tillman v. Westwego Police Dep't, No. CIV.A. 12-1032, 2012 WL 5830572, at *3 (E.D. La. Nov. 16, 2012).  But here, Edenfield argues that he did not have notice of his race discrimination claim (i.e., that others outside of his class had not received the same penalties for similar conduct) until after the time period for raising claims in the civil service appeal had passed. He has not presented any evidence to support this contention—but he cannot be faulted for failing to explore this issue in discovery when the City did not raise res judicata until after the discovery deadline passed.

### 3. Issue Preclusion

Louisiana law also provides for issue preclusion or collateral estoppel: "A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment." La. Stat. § 13:4231(3); see McDonald v. Cason, 2001-0932 (La. App. 3 Cir. 12/12/01), 801 So. 2d 1255, 1262. Arguably this defense is also waived by the City's failure to raise res judicata as an affirmative defense in its Answer.

Even if issue preclusion has not been waived, the Court finds it does not bar Edenfield's action. First, the City argues that Edenfield was not terminated but rather was suspended for 80 days as a result of the Louisiana Supreme Court's judgment. The Supreme Court's ruling on this point impacts the damages available to Edenfield, but it does not prevent Edenfield from challenging the discipline he ultimately received as discriminatory. Second, the City argues that the Louisiana Supreme Court has determined that the City had lawful cause to discipline Edenfield for the Level F offense. But this finding does not preclude a determination in this action that Edenfield experienced race discrimination if he shows that the discipline was, nonetheless, motivated by his race. The Supreme Court's ruling is not determinative of Edenfield's claims.

### 4. Race Discrimination

#### a. Standard

Title VII prohibits a covered employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "[A] plaintiff may present his case by direct or circumstantial evidence, or both." Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 896 (5th Cir. 2002).

"Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." Id. at 897. "If the plaintiff produces direct evidence that discriminatory animus played a role in the decision at issue, the burden of persuasion shifts to the defendant, who must prove that it would have taken the same action regardless of discriminatory animus." Id. at 896.

If the plaintiff relies on circumstantial evidence of discrimination, then the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), applies. Id. Under that framework, the plaintiff must first establish a *prima facie* case of discrimination. Id. To do this, plaintiff must show that he "was: (1) a member of a protected class; (2) qualified for the position held; (3) subject to an adverse employment action; and (4) treated differently from others similarly situated." Abarca v. Metro. Transit Auth., 404 F.3d 938, 941 (5th Cir. 2005). If the plaintiff meets his burden, "the employer must respond with a legitimate, nondiscriminatory reason for its decision." Russel, 235 F.4d at 222.  "This burden on the employer is only one of production, not persuasion, involving no credibility assessments." Id. "If the defendant meets its burden, the presumption of discrimination created by the prima facie case disappears, and the plaintiff is left with the ultimate burden of proving discrimination." Sandstad, 309 F.3d at 897. "The plaintiff, who always has the ultimate burden, must then 'produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination.'" Outley v. Luke & Assocs., Inc., 840 F.3d 212, 216 (5th Cir. 2016) (quoting Burton v. Freescale Semiconductor, Inc., 798 F.3d 222, 233 (5th Cir. 2015)).

### b. *Direct Evidence of Discrimination*

Edenfield argues that there is direct evidence of discrimination here because when asked why she found that Edenfield's use of the words "animals" and "savages" was racially motivated,

Westbrook replied that she was an African American woman.[32] He insists that this demonstrates that she used her personal bias as an African American woman and after meeting with Black Lives Matters and Take Them Down Nola protesters.[33] He insists that these meetings were biased in favor of these minority led groups. He points out that Lieutenant Thomas found the posts at issue were directed towards criminals and not towards people of particular races.[34] The City responds that Edenfield misconstrues Westbrook's testimony and that his argument about the influence of the protest groups is speculative.

Edenfield submits that another example of direct evidence of discrimination is that Westbrook stated that she did not believe in reverse racism during a 2016 training.[35] The City argues this unsubstantiated hearsay is not sufficient summary judgment evidence. As the City points out, the Inspector's General's investigation into this alleged statement found that 19 of the 21 PIB personnel who attended the training did not hear Westbook make any comments about reverse racism.[36] Per the report, one attendee recalled her saying she did not believe that "whites

---

[32] In her deposition in this case, Westbrook was asked on what basis she understood the terms "animals" and "savages" as race disparaging, she responded "I am an African-American female." ECF No. 48-2, at 6.

[33] Westbrook was asked what community leaders she was referring to in her cover letter analyzing Edenfield's comments. Id. at 7. She responded that there was a big meeting with at least 10 individuals and that she would have to go back and look at her list of people, but that she recalled people with Take Them Down Nola and Black Lives Matter were there. Id. at 8.

[34] The memo cited by Edenfield notes that "Lt. Thomas stops short of determining Edenfield's comments were racial in nature- because there were different ethnicities committing some of the criminal acts that Sgt. Edenfield was commenting about in his posts and he said his posts referred to the criminal activity of the individuals and not the individual's race." ECF No. 48-6, at 1. The comments were found to be "disparaging; with some containing insulting, belittling, and discourteous language." Id.

[35] He cites a 2016 PIB investigation initiated when Westbrook stated at a community forum regarding a shooting incident involving Jefferson Parish Sheriff's Office deputies that "if that was our Police Officer because its so contrary to our policy they would have been arrested on the spot. So the difference is is (sic) that we've got to look at what their policy is but in New Orleans we would not have been authorized, we would not have been authorized in New Orleans to do any of those actions." ECF No. 48-9, at 2. It is unclear how this statement could be "extrapolated" to the conclusion that Westbrook does not believe she can discriminate against Edenfield because he is white, as he argues here. At a minimum, this would require an inference that would preclude characterizing this as direct evidence of discriminatory animus. Edenfield appears to be relying more on the second complaint that was also investigated as part of this 2016 PIB investigation:  NOPD Major Raymond Burkhart reported that he had received an anonymous call reporting that Westbrook stated during an in-service training that she did not believe in reverse discrimination." Id. at 3.

[36] Id. at 7.

could discriminate against blacks."[37] And one attendee reported that Westbook stated she was "not one hundred percent on board with reverse discrimination." [38] The investigators also considered the class notes taken by the Federal Consent Decree Monitor, who noted that Westbrook stated "I have not seen evidence of reverse discrimination."[39]

As a third example of direct evidence of discrimination, Edenfield points to Westbrook's testimony in a 2020 civil service hearing involving a different employee in which she stated that there were rumors that the department was going after black officers and not white officers.[40] Edenfield argues that this statement shows that Westbook was motivated to reverse such rumors and start going after white officers. The City responds that Edenfield's theory is entirely subjective and speculative.

The Court finds that the evidence cited by Edenfield is not direct evidence of discrimination. As discussed above, direct evidence must prove discriminatory animus without inference or presumption. In other words, "[i]f an inference is required for the evidence to be probative as to [the employer's] discriminatory animus in firing [the employee], the evidence is circumstantial, not direct." Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 897–98 (5th Cir. 2002). In Sandstad, the worker argued that the company's policy of identifying younger managers

---

[37] Id. It is unclear if this is an error, and whether the report instead intended to note that this attendee actually believed they heard words to the effect that Westbrook did not believe blacks could discriminate against whites.
[38] Id.
[39] Id. During the investigation, Westbrook stated that she remembered discussing racial profiling and that she stated that PIB had received relatively few complaints on racial profiling over the last six years. Id.
[40] Westbrook was asked to explain the process of surveillance and why surveillance had been conducted in a particular instance. ECF No. 48-27, at 4. She testified that "around the time that we had the investigation of Randi Gant the department kind of went through what I call shock in that once the investigation started and officers started to look and see that this was a possibility that this would be something that PIB would be investigating and also looking at individuals for all of a sudden you have people that were kind of scrambling in terms of looking for their forms trying to figure out whether we were looking at them. So we had a scenario where we had a number of rumors going that this was something that we were going after that they considered a black officer and not looking at any of the white officers and more specifically people within the command unit. And so that was the rumor mill that we were basically just going after what they call low-hanging fruit and nobody was looking at the potential officers of that course [sic] would have been grandfathered in and potentially would be living outside of the parish and so that's where the rumor mill started." Id. at 4-5.

for promotion to senior management, "ultimately replacing senior management" was direct evidence of age discrimination. Id. at 897. The court of appeals found this was not direct evidence because it required the inference that senior managers were to be fired to make room for younger trainees as opposed to being replaced as they retired or changed jobs. Id. In contrast, the court of appeals found direct evidence of discrimination where one witness testified that she had been told by the hiring supervisor or his assistant that they were not going to hire a black person as a poker dealer unless there were extenuating circumstances, that "good old white boys don't want blacks touching their cards in their face" and where another witness testified that the decision maker had told him that "maybe I've been told not to hire too many blacks in the poker room." Jones v. Robinson Prop. Grp., L.P., 427 F.3d 987, 993 (5th Cir. 2005). The court found that in the light most favorable to the plaintiff, this evidence proved "without inference or presumption, that race was *a* basis in employment decisions in the poker room at [the casino]." Id.

The examples cited by Edenfield are speculative and require multiple inferences to arrive at the conclusion that Westbrook was motivated by a discriminatory animus when disciplining Edenfield. He claims that because Westbrook used her personal experience as an African American woman and her meetings with certain community groups in determining that Edenfield's comments were racially motivated, she demonstrated bias or favoritism. As an initial matter, bias and favoritism are only actionable under Title VII if they are based on a protected characteristic— here, race. Edenfield does not even argue that is the case. Even if the Court infers that Edenfield intended to argue that this evidence shows Westbrook demonstrated *race-based* bias and favoritism, the evidence itself still requires inferences to get there. One must infer that when Westbrook believed and took seriously the complaints of Black Lives Matter and Take Them Down Nola protest leaders' complaints about the comments and relied in part on those concerns

to elevate the penalty level, that she did so because they were Black as opposed to because they were community leaders voicing complaints. As to Westbrook's testimony that she found the words "animals" and "savages" to be racially disparaging[41] because she is an African American female, this cannot demonstrate racial animus in recommending a Level F penalty without inferring that in considering her personal experiences in assessing the offensiveness of the comments, she was motivated to punish Edenfield more harshly because she is Black or that she did so because Edenfield is White—in other words, that had he been Black and all other factors the same, she would not have found the use of those terms to be worthy of the same penalty. If inferences are required, the evidence cannot be direct evidence of discrimination.

Accepting as true the contradicted hearsay evidence that Westbrook stated she was not one hundred percent on board with reverse discrimination still does not amount to direct evidence of discrimination. To find racial animus, the Court would have to infer that Westbrook's alleged statement about reverse discrimination in general in 2016 impacted her assessment of Edenfield's social media posts four years later in 2020.

Finally, Westbrook's testimony about rumors that the NOPD was going after black officers and not white officers cannot possibly serve as direct evidence of racial animus. To find racial animus here, one would have to infer that because of these rumors (which did not, incidentally, concern violations of the social media policy), Westbrook was motivated to take the opposite

---

[41] A review of employment discrimination cases shows numerous examples of African American employees' complaints that the use of the terms "animals" and "savages" amounted to racial slurs and/or race based harassment. E.g., Miller v. New York State Police, No. 14-CV-00393A(F), 2019 WL 7582838, at *5 (W.D.N.Y. Aug. 22, 2019), report and recommendation adopted, No. 14-CV-393-A, 2020 WL 6465435 (W.D.N.Y. Nov. 3, 2020); Rainey v. Dep't of Soc. Servs., No. 3:17-CV-1222 (VAB), 2018 WL 4623031, at *7 (D. Conn. Sept. 26, 2018); Carmody v. Vill. of Rockville Ctr., 661 F. Supp. 2d 299, 321 (E.D.N.Y. 2009). And Superintendent Ferguson testified that he could understand how Edenfield's comments could be perceived as derogatory from a black perspective "because of certain words that was used has some historical meanings to it going back in history." ECF No. 42-6, at 17.

approach and target white officers instead of black officers and, further, that her recommendation as to Edenfield was part of that approach.

There is no way to interpret the evidence cited by Edenfield as direct evidence of discriminatory animus by Westbrook in determining that Edenfield's social media posts qualified for a Level F penalty of dismissal, and therefore, he cannot survive summary judgment on a direct evidence theory of discrimination. Moreover, had Edenfield established a fact issue on the question of whether there is direct evidence of Westbrook's discriminatory animus, he would also have to show that Westbrook's animus influenced Ferguson—the ultimate decision maker. He cannot meet this threshold either.

"To invoke the cat's paw analysis, [plaintiff] must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decisionmaker.'" Roberson v. Alltel Info. Servs., 373 F.3d 647, 653 (5th Cir. 2004). To show that Ferguson accepted Westbrook's recommendation without independent analysis, Edenfield relies on Ferguson's testimony that he did not watch the videos that Edenfield shared in his posts, that he was only somewhat familiar with the disciplinary matrix, and that he did not consider mitigating factors. ECF No. 48-2, 15, 17-18. These examples do not suggest that Ferguson failed to review or consider the posts themselves and the impact on the department. This evidence simply could not show that Ferguson was merely a conduit for Westbrook, especially where Ferguson also testified that his decision to terminate was not based on Westbrook's cover letter but was based on his own personal opinion and assessment of everything, including his concerns about Edenfield's ability to testify and his having advocated violence against people who seemed to be peacefully protesting. ECF No. 42-6, at 5, 12, 17, 23. It is also significant that Westbrook was performing this review and

wrote the cover letter at the request of Ferguson because he did not believe that a 5-day suspension was sufficient discipline.[42]  This, too, belies any notion that he was merely a conduit to give effect to Westbrook's discriminatory animus, as alleged by Edenfield.

       *c.   Comparators*

       The next analysis, then, is whether Edenfield has presented circumstantial evidence of discrimination.   As stated above, this triggers the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under that framework, the plaintiff must first establish a *prima facie* case of discrimination. Id.  To do this, plaintiff must show that he "was: (1) a member of a protected class; (2) qualified for the position held; (3) subject to an adverse employment action; and (4) treated differently from others similarly situated." Abarca v. Metro. Transit Auth., 404 F.3d 938, 941 (5th Cir. 2005).

       The City concedes that the first three elements of Edenfield's prima facie case have been met. But it argues that he cannot show that he was treated differently from others similarly situated. "Employees are similarly situated when they (1) 'held the same job or responsibilities,' (2) 'shared the same supervisor or had their employment status determined by the same person,' and (3) 'have essentially comparable violation histories.'" West v. City of Houston, Texas, 960 F.3d 736, 740 (5th Cir. 2020) (quoting Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 260 (5th Cir. 2009)). Indeed, the courts require that the employee "demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'" Lee, 574 F.3d at 260 (quoting Little v. Republic Ref. Co., 924 F.2d 93, 97 (5th Cir. 1991)). But the "'nearly identical' standard is not equivalent to 'identical.'" Id. at 260 n. 25. To avoid summary judgment, the plaintiff must present "sufficient

---

[42] ECF No. 42-7, at 7.

evidence that would permit a reasonable fact-finder to conclude that the plaintiff and other employees are similarly situated." Morris v. Town of Indep., 827 F.3d 396, 402 (5th Cir. 2016).

Edenfield argues that Black officers charged with violating Rule 13(3) were treated more favorably than he. He cites nine examples of Black officers receiving a lesser penalty for policy violations. Not one of these other officers was charged with a Level F penalty (i.e., Paragraph 41 of the Disciplinary Matrix for Illegal Use of Social Media), as the City points out. Although the City argues that this alone precludes finding these individuals could be comparators,[43] the Court disagrees. If the NOPD found nearly identical conduct by similarly situated Black officers did not rise to the level of Paragraph 41, this could show that Black officers had been treated more favorably.

Nonetheless, interpreting the evidence in the light most favorable to Edenfield, no reasonable juror could conclude that any of the cited individuals are comparators. Edenfield cites the following examples involving Black NOPD officers:

- Kevin Williams received a one-day suspension for posting "I wanna fight" and calling a citizen a "bald ass head."[44]

- Nahlisha Smith received a 20-day suspension for posting the statement "I wish them miserable bishes stop texting my phone and be concerned with why their man car is

---

[43] In apparent support for rejecting the City's argument, Edenfield also points out that there is no separate Rule in the policy manual for illegal social media use. As discussed above, Rule 13(3) prohibits employees from posting "any material on the internet including but not limited to photos, videos, word documents, etc. that violates any local, state or federal law, and/or embarrasses, humiliates, discredits or harms the operations and reputation of the Police Department or any of its members." ECF No. 48-10, at 4. The Disciplinary Matrix describes two social media violations at Paragraph 40 (with a Level C Penalty) and Paragraph 41 (with a Level F Penalty). To the extent Edenfield argues he could not have been charged pursuant to Paragraph 41 because it does not correspond to a policy violation, he offers no legal support for such a conclusion. The issue before the Court in this lawsuit is whether Edenfield experienced race discrimination, not whether Paragraph 41 was properly drafted.
[44] ECF No. 48-16.

parked in the driveway of the calliope project. Don't come for me unless I send for you. I don't want him. But it's obvious he don't want just you either."[45]

- Nahlisha Smith received a five-day suspension for posting a picture of herself with the caption "The face you make when a Lieutenant in PID makes you change your uniform shirt. I hate wearing TDU. This is bullshit."[46]

- Quannecia Booker received a five-day suspension for sharing a video of a woman bathing nude from the waist up.[47]

- Shantell Howard received a two-day suspension for posting three videos she recorded during roll call at the Third District station, including herself saying "Lieutenant you know you are my boy! I may not mess with all of them, but I fucks with you," referring to one of the new officers as "new booty," and calling herself a lieutenant instead of an officer.[48]

- Kianka Hunter received a letter of reprimand for exchanging text messages with another officer (who was involved with Hunter's boyfriend or ex-boyfriend), including stating that the other officer was "laying up with a skank," and posting the text exchanges to social  media.[49]

- Rayell Johnson received a one-day suspension for posting to social media a music video in which he appeared in his unmarked vehicle and with some scantily dressed women dancing.[50]

---

[45] ECF No. 48-17.
[46] ECF No. 48-18.
[47] ECF No. 48-19.
[48] ECF No. 48-20.
[49] ECF No. 48-21.
[50] ECF No. 48-22; Depo. of Banks, ECF. No. 48-12, at 6.

- Dennis Laurie received a letter of reprimand for making inappropriate comments during roll call  with his "opinion" as to why New Orleans and Louisiana have a high AIDS/HIV diagnosis rate (it was alleged, but could not be confirmed during the investigation, that he stated "if homosexuals and lesbians weren't fucking each other, then we wouldn't have AIDS.").[51]

- Jimmie Turner was demoted for making comments suggesting a subordinate was a homosexual; making vulgar, discourteous, and unprofessional comments; and engaging in uninvited and unwanted touching of the subordinate.[52]

Laurie and Turner cannot be comparators. Their misconduct does not involve social media at all. As a result, it does not implicate some of the factors considered in Edenfield's case. Moreover, because their misconduct involves violation of different policies and/or rules, it implicates different penalties. The evidence could not support finding that Laurie and Turner were similarly situated, and they cannot be comparators in support of Edenfield's race discrimination claim.

The other purported comparators fare no better. As discussed in the background section above, NOPD found Edenfield had violated the social media policy at a Level F penalty level. Paragraph 41 of the Disciplinary Matrix applies to the following part of Rule 3(13): "Employees shall not post any material on the Internet that violates any local, state or federal law, or includes hate speech, discrimination or advocates unnecessary force."[53] Edenfield reposted eight articles or videos regarding the Black Lives Matter protests with his own comments, including labeling individuals "trash bitch," animals," and "savages." Two posts included threatening or suggesting

---

[51] ECF No. 48-23.
[52] ECF No. 48-24.
[53] ECF No. 42-5, at 12.

violence:  "I am running them over and shooting if lethal force were my only way out" and "Burn down her house, Blow up her car and see if she still feels the same way."

Unlike Edenfield, the social media posts of Johnson, Hunter, Howard, Booker, and Smith (as to the five-day suspension) did not advocate violence. Nor is there any suggestion that their posts could be interpreted as hate speech or discriminatory. Their conduct could not be considered comparable to that of Edenfield, and they could not be found similarly situated. Moreover, the City points out that Johnson, Hunter, Howard, Smith were officers, not sergeants like Edenfield, which further shows they were not similarly situated.[54]

The Williams post and the Smith post resulting in a 20-day suspension arguably advocate violence. The Williams post showed that he was upset that Harold Clay, principal of the John F. Kennedy High School, had not attended the school supply drive and that he was arrogant and ignorant.[55] Williams described Clay as a "bald ass head," and in the comments thread, Williams posted "Fuck that. I wanna fight."[56] The Smith post included a photograph of the complaining citizen's car with the caption "I wish them miserable bishes stop texting my phone and be concerned with why their man car is parked in the driveway of the calliope project. Don't come for me unless I send for you. I don't want him. But it's obvious he don't want just you either."[57] There is no suggestion the Williams and Smith posts contain hate speech or discrimination. To the extent they advocate violence, the violence threatened is less serious than shooting and running over people. Moreover, the posts are directed at specific individuals, not groups of citizens the way Edenfield's posts are directed at protesters. Unlike the alleged comparators, Edenfield posted eight messages over the course of a week in the context of national protests following the death of

---

[54] The City also says that Booker was an officer, but the discipline letter addresses him as sergeant. ECF No. 48-19.
[55] ECF No. 48-16, at 4.
[56] Id.
[57] ECF No. 48-17.

George Floyd. Additionally, Williams and Smith were a different rank than Edenfield—officers not sergeants. Williams and Smith cannot be found similarly situated and their misconduct was not nearly identical.

Because Edenfield has failed to establish his prima facie case, the City is entitled to summary judgment dismissing his case against it.

Even if the Williams and Smith incident could create an issue of fact as to whether similarly situated Black officers were treated more favorably, the City has shown that it had a legitimate and non-discriminatory reason for disciplining Edenfield. His social media posts clearly advocate unnecessary force and use terms historically used to demean African Americans to describe Black Lives Matters protesters. They fall within the definition of offense that qualifies for a Level F penalty under the Disciplinary Matrix. This finding was affirmed by the Commission, the Louisiana Fourth Circuit Court of Appeals, and the Louisiana Supreme Court.

The burden would then shift to Edenfield to show substantial evidence that the NOPD's legitimate reason was pretext for discrimination. He cannot meet this burden. He relies on the same evidence that he argued was direct evidence of discrimination. As discussed above, that evidence is highly speculative and cannot support finding that the recommendation of Westbrook, let alone the decision of Ferguson, was motivated by race.

Conclusion

Although the Court has found that res judicata principals do not preclude Edenfield's claim, the City is entitled to summary judgment because Edenfield has failed to establish a prima facie case of race discrimination through either direct evidence of discrimination or by showing he was treated less favorably than similarly situated employees. Accordingly, the City's Motion for

Summary Judgment (Rec. Doc. 42) is GRANTED; Edenfield's claims are dismissed with prejudice.

New Orleans, Louisiana, this 23rd day of April, 2024.

_____
Janis van Meerveld
United States Magistrate Judge